No. 14-3201

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

Ratna Bagwe,
Plaintiff-Appellant,

v.

Sedgwick Claims Management Services, Inc., et al.,
Defendants-Appellees.

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 11-cv-2450
The Honorable Magistrate Judge Young B. Kim

---

**BRIEF OF DEFENDANT-APPELLEES
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,
TAMMY LECLAIRE AND ANGELA PAPAIOANNOU**

---

Nadine C. Abrahams
Monica H. Khetarpal
Jason A. Selvey
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Phone: (312) 787-4949
abrahamsn@jacksonlewis.com
monica.khetarpal@jacksonlewis.com
selveyj@jacksonlewis.com

Dated: March 4, 2015

ORAL ARGUMENT REQUESTED

## Seventh Circuit Rule 26.1 Disclosure Statement

Appellate Court Number: **14-3201**

Short Title: **Ratna Bagwe v. Sedgwick Claims Management Services, Inc., et al.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3): **Sedgwick Claims Management Services, Inc., Tammy LeClaire, and Angela Papaioannou**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: **Jackson Lewis P.C. (note: prior to December 1, 2013, this firm was known as "Jackson Lewis LLP")**

(3)     If the party or amicus is a corporation:
        (i) Identify all its parent corporations, if any: **Sedgwick Claims Management Services, Inc. is a wholly owned subsidiary of Sedgwick Holdings, Inc. which itself is a fully owned subsidiary of Sedgwick, Inc.**
        (ii) list any publicly held company that owns 10% or more of the party's or amicus' stock: **No publicly held entity holds an ownership interest in Sedgwick Claims Management Services, Inc. or Sedgwick Holdings, Inc. Kohlberg Kravis Roberts & Co. L.P. is a publicly held company which owns 10% or more of Sedgwick, Inc.'s stock.**

Attorney's Signature:     s/ Nadine C. Abrahams          Date: 3/4/15
Attorney's Printed Name: **Nadine C. Abrahams**

Attorney's Signature:     s/ Monica H. Khetarpal          Date: 3/4/15
Attorney's Printed Name: **Monica H. Khetarpal**

Attorney's Signature:     s/ Jason A. Selvey          Date: 3/4/15
Attorney's Printed Name: **Jason A. Selvey**

Are you *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d)? **Yes**

Address: **Jackson Lewis P.C., 150 North Michigan Avenue, Suite 2500, Chicago, Illinois  60601**

Phone Number: **312-787-4949** / Fax Number: **312-787-4995**

Email Addresses: **abrahamsn@jacksonlewis.com /
monica.khetarpal@jacksonlewis.com / selveyj@jacksonlewis.com**

## Table of Contents

Seventh Circuit Rule 26.1 Disclosure Statement ................................. i-ii

Table of Contents ............................................................ iii-vi

Table of Authorities ........................................................ vii-viii

Jurisdictional Statement ...................................................... 1-2

Statement of the Case ........................................................ 3-29

    I.    Bagwe's Position at Sedgwick ............................................ 3-6

    II.   Bagwe Initially Complains About Her Compensation ..................... 7-11

        A.    Sedgwick's Methods for Determining Compensation
             Increases ........................................................ 7-8

        B.    Bagwe's Initial Pay Complaints Do Not Mention Any Protected
             Category ........................................................ 8-9

        C.    Resolution of Pay Complaints ................................. 10-11

    III.   Bagwe's Performance Deficiencies After Her 2007 Promotion ...... 11-18

        A.    Bagwe's January 2009 Confrontation with Coyle and
             French ........................................................ 14-16

        B.    Bagwe's Performance Improvement Plan… ........................ 16-17

        C.    Bagwe's Response to the PIP ................................. 17-18

    IV.   Plaintiff's 2009 Complaints ............................................ 18-22

        A.    Bagwe's First Complaint of Discrimination .................... 18-19

        B.    Bagwe's Follow-Up Complaint ..................................... 19

        C.    Stephanie Simpson Concludes the Investigation ............... 20-22

    V.    Bagwe's Termination. ................................................. 22-27

    VI.   Bagwe's Replacement ................................................. 27-28

VII.   Post-Termination Events ................................................ 28-29

**Summary of the Argument** ........................................................30

**Argument** ................................................................ 31-57

I.   Bagwe  Stubbornly Refuses to Follow the Established Framework for
     Analyzing Discrimination and Retaliation
     Claims.............................................................. 31-34

II.  The District Court Correctly Dismissed Bagwe's Discrimination
     Claims.............................................................. 34-45

     A.   Bagwe Cannot Make Out a Case Under the Direct
          Method ...................................................... 34- 39

          1.  Papaioannou's Alleged Comment Was Not Circumstantial
              Evidence of Discrimination ............................... 34-38

          2.  LeClaire's Comment About Bagwe's Husband Also Is Not
              Circumstantial Evidence of Discrimination .................... 38-39

     B.   Bagwe Cannot Establish Her Discrimination Claims Under the
          Indirect Method ................................................ 39-45

          1.  Bagwe Was Not Meeting Legitimate Performance
              Expectations .................................................. 39-40

          2.  Bagwe's Termination Is the Only Adverse Action ................40

          3.  Bagwe Cannot Identify Any Similarly Situated Individuals
              Who Were Treated More Favorably.............................. 40-43

              a.  Enneking Was Not Treated More Favorably Than
                  Bagwe ................................................. 41-42

              b.  Enneking, Betz and Lanier Were Not Comparable to
                  Bagwe ................................................. 42-43

          4.  There Is No Evidence of Pretext ....................... 43-45

              a.  The Scope of the Investigation Into Bagwe's 2009
                  Complaints Was Reasonable................................... 43-44

b.  Bagwe's Salary as Operations Manager III Was Justified...........................................................44

c.  Other Evidence Affirmatively Demonstrates a Lack of Pretext..................................................... 44-45

III.  The District Court Also Correctly Dismissed Bagwe's Retaliation Claims ........................................ 45-56

A.  Bagwe Cannot Succeed Under the Direct or Indirect Methods of Proof ...................................... 45-56

1.  Nothing Prior to February 2009 – the First Protected Activity – Can Be Evidence of Retaliation....................................45

2.  Bagwe's Termination Remains the Only Adverse Action .................................................... 46-48

a.  Bagwe's PIP Was Not an Adverse Action ....................46

b.  There Is No Evidence of Post-Employment Retaliation................................................ 46-48

3.  There Is No Causal Link Between Protected Activity and Adverse Actions ...................................... 48-49

4.  Bagwe Was Not Meeting Defendants' Expectations and Has Not Identified a Similarly Situated Individual ..................................49

5.  Bagwe Has Failed to Establish Pretext................................. 49-56

a.  Papaioannou's Alleged "Warning" to Bagwe About LeClaire Is Immaterial..................................49

b.  Timing Issues Do Not Indicate Pretext................... 49-51

c.  Bagwe's 2009 Compensation Is Not Evidence of Pretext.......................................................51

d.  The Scope of Simpson's Investigation Is Not Evidence of Pretext........................................................51

e.  Conflicting Recollections of the Specific Details of the Termination Decision Are Immaterial and Not

Evidence of Pretext.................................................... 52-53

f. LeClaire's Account of Bagwe's Performance Post-PIP Is Not Evidence of Pretext ....................................................54

g. Bagwe's Performance on Technical Aspects of Her Job Are Not Pretext......................................................... 54-55

h. The Procedures Used for Bagwe's Termination Are Not Evidence of Pretext.................................................... 55-56

IV. Miscellaneous Claims ........................................................ 56-57

A. Bagwe's Pay Claims Are Time-Barred and Waived.............. 56-57

Conclusion .................................................................................58

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(B) ..................................59

Certificate of Compliance with Fed. R. App. P. 25 and Cir. R. 25 ......................60

Certificate of Service ................................................................61

# Table of Authorities

**Cases**                                                                            **Page(s)**

*Ash v. Tyson*,
  546 U.S. 454 (2006) ...............................................................................38

*Burlington N. Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ................................................................................ 32

*Chiaramonte v. Fashion Bed Group, Inc.*,
  129 F. 3d 391 (7th Cir. 1997) ...............................................................44

*Cullom v. Brown*,
  209 F.3d 1035 (7th Cir. 2000) ..............................................................46

*Egan v. Freedom Bank*,
  659 F.3d 644 (7th Cir. 2011) ...........................................................33, 48

*Goodman v. Nat'l Sec. Agency, Inc.*,
  621 F.3d 651 (7th Cir. 2010) ........................................................... 32-33

*Harris v. Warrick County Sheriff's Dep't*,
  666 F.3d 444 (7th Cir. 2012) .................................................................54

*Hutt v. Abbvie Products LLC*,
  757 F.3d 687 (7th Cir. 2014) ...........................................................32, 33

*Overly v. Keybank Nat'l Ass'n*,
  662 F.3d 856 (7th Cir. 2003) ................................................................. 37

*Perez v. Thorntons, Inc.*,
  731 F.3d 699 (7th Cir. 2003) ...........................................................36, 38

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ...............................................................................38

*Schindler v. Seiler*,
  474 F.3d 1008 (7th Cir. 2007) ..............................................................47

*Shager v. Upjohn*,
  913 F.2d 398 (7th Cir. 1990) ................................................................38

*Smith v. Lamz*,
  321 F.3d 680 (7th Cir. 2003) ................................................................35

*Springer v. Durflinger*,
  518 F.3d 479 (7th Cir. 2008) ........................................................46, 53

*Tank v. T-Mobile USA, Inc.*,
  785 F.3d 800 (7th Cir. 2014) ............................ 31, 32, 33, 35, 39, 40, 41, 43-44, 55

*Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*,
  344 F.3d 680 (7th Cir. 2003) ...................................................... 36

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994) ........................................................3

*Whitfield v. Int'l Truck & Engine Corp.*,
  755 F.3d 438 (7th Cir. 2014) ......................................................31

## Statutes

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1343 ................................................................................1

28 U.S.C. § 1367 ................................................................................1

42 U.S.C. § 1981 *et seq.* ..............................................1, 31, 32, 57

42 U.S.C. § 2000e *et seq.* ............................................1, 31, 32, 57

775 ILCS 5/1 *et seq.* .....................................................1, 31, 32, 57

## Other Authorities

Practitioner's Handbook for Appeals .................................................46

Fed. R. App. P. 28(b) ...........................................................................1

Fed. R. App. P. 28(a)(8)(A) .........................................................46, 57

Local Rule 56.1(a)(3) ...........................................................................1

## Jurisdictional Statement

Pursuant to Fed. R. App. P. 28(b), Defendant-Appellees Sedgwick Claims Management Services, Inc., Tammy LeClaire, and Angela Papaioannou state that Plaintiff-Appellant Ratna Bagwe's Jurisdictional Statement is not complete and correct. To provide the court with the complete jurisdictional summary required by rule, Defendant-Appellees amend Bagwe's Jurisdictional Statement (App. Br. 1)[1] as follows.

Bagwe alleged claims under the Civil Rights Act of 1866, 42 U.S.C. §1981 et seq. ("§1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), the Illinois Human Rights Act, 775 ILCS 5/1 et seq. ("IHRA"), and state common law. The district court had jurisdiction pursuant to 28 U.S.C. §§1331, 1343 and 1367, and 42 U.S.C. §2000e-5(f)(3). Defendants moved for summary judgment on April 30, 2014. (R.142.) All parties had consented to exercise of jurisdiction by Magistrate Judge Kim on December 1, 2011. (R.31.) Bagwe seeks review of the Magistrate Judge's September 5, 2014 order granting Defendants' motion for summary judgment and the final judgment for Defendants on all claims entered on September 8, 2014. (Opinion; A-46). Bagwe

---

[1] Citations to the record appear throughout as "(R.xx)" with "xx" representing the district court docketing number of the document. Citations to Bagwe's Appendix appear as "(A-xx)," with the citation representing the page number Bagwe has stamped on a given Appendix page. "App. Br." refers to the Brief of Plaintiff-Appellant (Appellate Dkt. 16). "Opinion" refers to the September 4, 2014 Memorandum Opinion and Order entered by Magistrate Judge Kim (A-1 – A-45 (R. 172)). When a fact is stated in Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1(a)(3), Defendants have cited that document (R.144) or, when Bagwe does not dispute the fact, to Bagwe's response thereto (R.162).

timely filed her notice of appeal on October 8, 2014. (R.179.) This Court has jurisdiction of this appeal pursuant to 28 U.S.C. §1291. Sedgwick is an Illinois corporation with a principal place of business located in Tennessee.

### Statement of the Case

The District Court granted the Defendant-Appellees summary judgment on each of Plaintiff-Appellant's claims, namely, discrimination based on race and national origin and retaliation. (Opinion; A-46.) Bagwe appeals that ruling.

### I. Bagwe's Position at Sedgwick

Plaintiff Ratna Pradip Bagwe was born in India and is of Indian descent. She was hired by Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick") in March 2001 and terminated on August 13, 2009. (R.162, ¶3.) The circumstances leading up to her termination form the basis of this lawsuit and appeal.[2]

Sedgwick provides claims management services to employers for a variety of claims. (R.162, ¶1.) Bagwe was hired by Defendant Tammy LeClaire (now Worthey) (White American) ("LeClaire") in 2001 as an Integrated Disability Manager II, which was a Grade 10 position. Throughout her career, Bagwe worked on Sedgwick's AT&T account. (R.162, ¶11.) Her job included managing a team of claims adjusters. (R.162, ¶11.)

---

[2] Bagwe makes a number of allegations in her Complaint, deposition and at summary judgment that do not appear in her appeal. For example, among many others, Bagwe does not raise her allegations that (1) Papaioannou, LeClaire and Betz were having a three-way affair, (2) that she was improperly denied a promotion to Operations Manager III in 2007, (3) that LeClaire made a comment about not liking her Indian sister-in-law, or that (4) Sedgwick interfered with her application for employment to a number of companies other than Matrix Absence Management. Because facts and evidence not raised on appeal are waived, Defendants have only addressed the claims and allegations actually contained in Bagwe's brief, as should this Court. *E.g., Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 n.5 (7th Cir. 1994) (arguments raised for the first time in an appellate reply brief are waived).

Sedgwick's AT&T account was structured in the following manner: from approximately 2001 to 2005, there were two primary offices, in Irving and Chicago. (R.162, ¶6.) Delaine Simmons (African-American) was the Operations Manager in Chicago. In 2004, Keith Lanier (White American) became the Operations Manager in Irving. (R.162, ¶6.) Simmons was Bagwe's direct supervisor from her hire until 2007. (R.162, ¶¶11,15; R.145-14, ¶2.) Bagwe considered Simmons to be her mentor and role model. (R.162, ¶27.) She "respected [Simmons] as a person with integrity who would not be racially biased." (*Id.*) Bagwe does not believe that Simmons discriminated against her based on her race or national origin, and does not believe that Simmons would lie under oath. (R.144, ¶27.)

LeClaire was the Managing Director (also called Regional Director) in charge of the AT&T account, among others. She reported to Brad Johnson (White American), the Executive Vice President. (R.162, ¶4.) As the Managing Director, it was LeClaire's responsibility to ensure that Sedgwick delivered on the services that were contracted for by clients. (R.162, ¶4.)

On January 16, 2005, Simmons, with LeClaire's approval, promoted Bagwe to Assistant Manager II, a Grade 11 position. (R.162, ¶12.) At the time of her promotion, Bagwe received a merit pay increase but not a promotional increase. (*Id.*) The promotion was only a title change to align Bagwe's title with her responsibilities. (*Id.*) There was overlap between her job duties in the positions and Bagwe had already begun to take on Assistant Manager

responsibilities prior to her promotion, such as taking on more LTD claims and managing LTD supervisors. (*Id.*)

Between February and September 2007, Simmons was working on a project in one of Sedgwick's California offices.  (R.162, ¶13.) Although Simmons remained the Operations Manager, Bagwe assisted with some of Simmons' duties. (*Id.*) Simmons was under the impression that Bagwe was performing well in her "interim" role. (*Id.*) Simmons continued to check in with Bagwe, answered her questions, and managed the workers' compensation team in Chicago. (R.144, ¶13.)  Bagwe did not receive a contemporaneous pay raise or bonus for her taking on additional responsibilities. (R.162, ¶53.)

After Simmons returned from California, Bagwe went on vacation. During this time, Simmons developed concerns with Bagwe's performance, including new hire training, leadership training and basic coaching. (R.144, ¶14.)  Simmons's concerns prompted her to insist that all new hires be retrained. (R.144, ¶14.)

In 2007, the reporting structures for a number of Sedgwick's accounts were revised and a new position, Area Manager, was created. (R.162, ¶8.) Simmons became the Area Manager for clients managed out of the Chicago office other than AT&T, and as a result, Bagwe no longer reported to her. (R.162, ¶8.) In August 2007, Defendant Angela Papaioannou became the Area Manager for the AT&T account. (R.162, ¶8.) Papaioannou is a White American

5

born in the United States, but her parents emigrated from Greece, and she considers herself to be Greek. (R.162, ¶5.)

In late 2007, LeClaire promoted Bagwe for the third time, this time into Simmons' former position as Operations Manager III in Chicago. (R.162, ¶15.) She promoted Bagwe despite Simmons' concerns about her performance and the fact that Simmons recommended against Bagwe's promotion. (R.144, ¶14.) At the time, LeClaire felt that Bagwe would do a good job. (R.162, ¶15.) Bagwe went from Grade 11 to Grade 13, received a $10,000 (11.11%) promotional pay raise and, just seven months later, received another pay raise of $3,000. (*Id.*) With this promotion, Bagwe began reporting to Papaioannou. (*Id.*)

Despite the restructuring, Lanier remained Operations Manager III in Irving. (R.162, ¶8.) In 2007, the Operations Manager in Atlanta resigned and was replaced by Paul Betz. (R.162, ¶8.) Unlike Bagwe, Betz had experience as both an account manager and an operations manager. (R.162, ¶74.) Sedgwick offered Betz a compensation and benefits package commensurate with his work experience, his required relocation from Chicago to Atlanta, and his increased responsibilities stemming from having a larger team in Atlanta. (R.162, ¶76.) Because they were all Operations Manager III employees, Bagwe, Lanier and Betz all reported to Papaioannou, who in turn reported to LeClaire. (R.162, ¶8.)

## II. Bagwe Initially Complains About Her Compensation

### A. Sedgwick's Methods for Determining Compensation Increases

Throughout her employment, Bagwe's and her peers' annual compensation was determined primarily by their direct supervisors in accordance with Sedgwick policies and the approval of management and Sedgwick's Colleague Resources Department (human resources, essentially – "CR"). (R.144, ¶16.)

Sedgwick establishes minimum, mid-point and maximum pay ranges for most positions. (R.144, ¶17.) Although budgets can vary year-to-year, a 3% increase is considered standard and 5% is unusual and reserved for outstanding performance. (R.144, ¶17.) Managers have discretion to award above-budget or below-budget pay raises for employees based on performance, but the average must stay at or under the budget. (*Id.*) At Bagwe's level, the employee's manager was given a pool of money to distribute among her direct reports. (R.162, ¶16.) She would make recommendations for compensation increases, and those recommendations were reviewed by that manager's supervisor, who would compare the recommendations to the MAPP scores. That individual would then forward the recommendations to the next level manager and CR for approval. (*Id.*) Terri Browne, Executive Vice President, Chief People Officer, and Jim Wiertelak, COO, conducted the final review and approved after reviewing each employee's review and the amount recommended with an eye toward internal equity across the entire company for similar jobs. (R.144, ¶16.)

7

There has never been a Sedgwick policy mandating a promotional increase for employees elevated from one grade to another when their salary continued to fall within the minimum and maximum ranges set by CR. (R.144, ¶23.) LeClaire is aware of others who were promoted without receiving a promotional increase. (R.162, ¶23.)

### B. Bagwe's Initial Pay Complaints Do Not Mention Any Protected Category

In early April 2008, during a conference call with Papaioannou and CR Representative Carla Street (White American), Bagwe complained about two aspects of her compensation. First, she complained that she did not receive a promotional increase when she was promoted to Assistant Manager II three years earlier, in 2005. She claims Simmons told her that, according to "company policy" and "process," she should have received a promotional increase and not just a merit increase. (R.144, ¶¶19,54.) Second, she claimed she should have received a pay raise in 2007 while she functioned as the Interim Operations Manager while Simmons was in California. (R.144, ¶19.) Papaioannou reminded Bagwe how the merit increase process worked and that there was a limit on salary increases. (R.162, ¶54.) Papaiannou also informed LeClaire of Bagwe's complaints. (R.162, ¶54.) On April 11, 2008, Bagwe sent a memo to Street outlining her concerns. (R. 163-24.)

Bagwe did not mention race, national origin, retaliation for engaging in protected activity, or any other protected category or behavior during her conversations with Papaioannou, and Street, or in her April 11th memo. (R. 163-

24.) Rather, Bagwe claimed that Simmons had promised her a promotional increase in 2005, and that she was pressured by LeClaire to deny her that increase. (R.162, ¶¶19,22.) Bagwe claimed that while she was speaking to Simmons in Simmons' office, LeClaire walked by and saw Bagwe through the window, thus Simmons was pressured to deny Plaintiff the pay increase. (R.162, ¶22.)

Simmons denies that LeClaire ever urged her not to give Bagwe a promotional increase or attempted to block her from doing so. (R.144, ¶25; 145-14, ¶9.) Simmons told Bagwe and LeClaire that Bagwe's allegations were "unprofessional and offensive;" Simmons had "never forgotten to compensate and recognize [Bagwe] in all positions . . . within the budget requirements identified." (R.144, ¶25.) Simmons also made clear to Bagwe that she expected Bagwe to bring any concerns about her compensation to her proactively and in a timely manner – not three years later. (*Id.*)

On April 14, 2008, Simmons sent Stephanie Simpson (White-American), a CR Representative working out of Sedgwick's Memphis headquarters, a formal complaint against Bagwe. (R.162, ¶26.) Simmons stated that she felt attacked by Bagwe and was offended by Bagwe's allegation that Simmons had promised her a promotional increase in 2005 and did not deliver. (*Id.*) LeClaire talked Simmons out of pursuing the complaint, advising Simmons that she would continue to work with Bagwe. (*Id.*)  Later that day Simmons withdrew her complaint.  (*Id.*)

C.  Resolution of Bagwe's Pay Complaints

LeClaire reviewed Bagwe's complaint and confirmed that she was given an appropriate raise in 2005 that was average for her peer group. (R.144, ¶54.) For example, Lanier also received a 3% pay increase. (*Id.*) Furthermore, Simmons did not recommend a promotional increase in 2005 because Bagwe's salary was already above the mid-point for the position into which she was promoted due to two above-budget pay raises of 5% in 2004 and 4% in 2003. (R.144, ¶18.) Simmons also did not recommend a promotional pay increase in 2005 because the promotion was designed to bring Bagwe's job title in line with what she was already doing and being paid for. (*Id.*)

LeClaire further determined that Bagwe was not entitled to a pay raise for serving as the "Interim" Operations Manager III in Simmons' absence, because other employees who have pitched in and temporarily filled two roles at once have not received pay raises. (R. 145-1, ¶¶29-30,54; 145-5, p.31 (pp.166-167 of transcript).)

In April 2008, Stephanie Simpson, a CR Representative working in Memphis also reviewed Bagwe's pay complaints and determined that neither of Bagwe's complaints had merit. (R.162, ¶10; 163-6, p.11 (transcript pp.54-55).)

Bagwe testified that her complaint to Simpson included allegations of discrimination and harassment. (R.163-1, p.33 (transcript p.666).) However, it is undisputed that Simpson did not understand Bagwe's complaint about her pay in 2008 had anything to do with her race, national origin, retaliation for

engaging in protected activity, or any other protected basis. (R.144, ¶20.) There is also no evidence that Simpson communicated to anyone else that Bagwe's complaints involved discrimination, harassment or any protected activity.  (R. 172 p. 43.)

### III. Bagwe's Performance Deficiencies After Her 2007 Promotion

At various times after her 2007 promotion to Operations Manager III, LeClaire noticed Bagwe's performance was lacking in four areas: 1) accepting constructive criticism; 2) deflecting constructive criticism by changing the subject and bringing up performance and disciplinary issues related to other employees; 3) leadership skills; and 4) engaging in unnecessarily confrontational and unproductive email correspondences with colleagues, causing her team to feel uncomfortable communicating with her. (R.144, ¶28.)

For example, LeClaire and Bagwe had a conversation in LeClaire's office in mid-2008 during which LeClaire attempted to help Bagwe "differentiate between a leader and just being a…technical manager." (R.144, ¶29.) LeClaire offered Bagwe a book, told her that she would like her to read it and then discuss her potential areas of development. (*Id.*) LeClaire perceived that, based on her body language, tone and demeanor, Bagwe reacted defensively. (*Id.*)

In approximately March 2009, while LeClaire was counseling Bagwe about her performance, Bagwe brought up an allegation that a co-worker, Anne Coyle, had made inappropriate remarks about another co-worker's sexual orientation. (R.144, ¶31; 145-5, p.21 (transcript pp.15-16); R. 162, ¶ 65; R. 172

11

p.7.) LeClaire felt the fact that Bagwe waited approximately nine months to bring these complaints to her or CR's attention was an example of poor leadership.  She also felt that the fact that she brought this issue up in the context of a discussion about her own performance issues was an example of deflecting constructive criticism. (*Id.*)

In another incident, while LeClaire attempted to counsel Bagwe about her performance, Bagwe instead began complaining about her subordinate Tonya Warner (African American). (R.144, ¶¶32,55.) LeClaire counseled Bagwe, stating, "[a]s a good leader, instead of doing the work for her, you had an opportunity to coach and mentor her…." (R.144, ¶32.)  Papaioannou also repeatedly counseled Bagwe not to take over projects for Warner, and that she should instead help Warner learn the skills to do them herself. (*Id.*) Despite this counseling, in approximately late March or early April 2008, Warner complained to Papaioannou that Bagwe failed to provide her with information she felt was necessary to do her job. She was also concerned that the tone of Bagwe's communications often became unnecessarily confrontational. (R.162, ¶56.) Warner then requested to be reassigned. (*Id.*) As a result, in early April 2008, LeClaire and Papaioannou reassigned Warner so she reported to Papaioannou. (R.162, ¶57.)

Another example of Bagwe's failure to communicate and demonstrate leadership skills was the contentious email communications in which she engaged. Bagwe's supervisors, peers and subordinates all experienced "email

wars" with Bagwe. (R.144, ¶33.) As a result, many of Bagwe's colleagues told LeClaire that they avoided even basic, simple correspondences with Bagwe. (*Id.*)

Another problematic incident involved Charles French (White American), an Account Executive for the AT&T Workers' Compensation account. French reported to LeClaire and was at the same grade level as Bagwe after her 2007 promotion. (R.162, ¶9.) However, LeClaire expected Bagwe, as well as Betz and Lanier, to answer to French because he reported directly to the client. (*Id.*)

In late 2008, French began noticing serious problems with Bagwe's team's performance. (R.144, ¶35.) On January 22, 2009, French sent an email to Papaioannou raising concerns about Bagwe's team relative to staffing issues. (R.162, ¶36.) French thought there were too many supervisors given the number of examiners. (*Id.*) Additionally, French stated that the team was negative and suffering from poor leadership. (*Id.*) French suggested a change in staffing and that Warner should manage the workers' compensation team based on her experience and understanding. (*Id.*) French forwarded this email to Coyle who responded in agreement. (*Id.*)

On February 5, 2009, French sent an email to Tobin Beckermann, a Client Performance Manager at Sedgwick, stating that he was engaged in an email war with Bagwe regarding staffing reductions and there was no reason for Bagwe to be acting as she was. (R.144, ¶37.) French stated to Beckermann that he was trying to provide AT&T with appropriate services at appropriate staffing levels, and that Bagwe did not seem to understand this and was not

cooperating in assisting French in completing the staffing reductions. (*Id.*) French felt that Bagwe was being combative, and working against him by focusing on an alternative business agenda. (*Id.*; R.145-20, ¶3.)

On February 25, 2009, French sent a memorandum to Street, LeClaire and Papaioannou addressing his issues relating to Bagwe. (R.144, ¶38.) The memorandum described issues related to operations, communications and judgment, and provided specific examples of his concerns about Bagwe's performance. (*Id.*) On March 6, 2009, French also noted that Bagwe was "diverting attention away from" Bagwe's team's failure to meet performance expectations. (*Id.*) Prior to issuing a performance improvement plan to Bagwe, Papaioannou counseled French to try to reconsider his approach, reviewed independent data related to the team's performance to verify French's concerns, and reviewed emails Bagwe had given her that purported to show that French was the one instigating the communication problems between the two. (R.144, ¶39.)

A. Bagwe's January 2009 Confrontation with Coyle and French

On or about January 7, 2009, Coyle, who reported to French, and Bagwe, got into a heated conversation in or near Bagwe's office. (R.162, ¶¶9,59.) Bagwe alleges Coyle was complaining that Bagwe's subordinates were not performing well and  Bagwe was making excuses for their poor performance. (R.162, ¶59.)

At some point during this conversation, French heard both Bagwe's and Coyle's raised voices and joined the conversation to try to persuade both to

lower their voices and listen to what the other had to say. (R.144, ¶60.) Coyle explained that Bagwe had accused her of making inappropriate remarks. (*Id.*) When French asked Bagwe to describe the remarks and identify who had said them, Bagwe either could not or would not do so. (*Id.*) French understood the remarks as not involving Bagwe or her race. (*Id.*)

Following this incident, French spoke with Street and told her that he felt that Coyle's behavior was inappropriate and that Bagwe was accusing Coyle of making inappropriate comments without providing any details. (R.144, ¶¶60,62.) French was concerned by Bagwe's vague accusations and the fact that she had not reported these accusations to CR when she learned of them. (R.162, ¶62.)

On February 10, 2009, French, Street and Bagwe met to discuss the allegations Bagwe made about Coyle on January 7, 2009. (R.144, ¶63.) During this meeting, Bagwe alleged that Coyle made an inappropriate comment on June 17, 2008, when Bagwe, LeClaire and Coyle were at a hotel bar around 10:30 the night before a work-related meeting in Atlanta. It was a social gathering, and Bagwe, LeClaire and Coyle did not discuss any aspect of Bagwe's job or employment with Sedgwick. (R.144, ¶64.) Rather, they discussed LeClaire's pending divorce. (*Id.*) Bagwe alleges that LeClaire suggested to Bagwe that she should get rid of her "old Indian husband" and get a "white man" because "white men are more fun," and that Bagwe did not know what she was missing. (*Id.*) She also claims that during this conversation, Coyle offered to

15

help Bagwe find a white man, and advised her to get rid of her "old Indian husband." (*Id.*)

During the February 10th meeting, Bagwe once again raised an issue she had brought up with LeClaire previously, namely that Coyle had made fun of Lanier's sexual orientation. She claimed the incident occurred at a meeting with a client in a bar in Irving, Texas, and that Coyle had made a clapping-type hand gesture to reference how gay people act. (R.162, ¶65.) Bagwe did not report the incident at the time, but rather first brought it to LeClaire's attention approximately nine months later. (*Id.*)

### B. Bagwe's Performance Improvement Plan

On March 12, 2009, after consultations between LeClaire, Papaioannou and Street, Bagwe was put on a PIP. (R.144, ¶40.) The PIP was prepared by Papaioannou and Street with input from French and LeClaire. (*Id.*) It was presented to Bagwe during a meeting with Papaioannou and LeClaire on March 12, 2009.  (R.162, ¶41.) During this meeting, Papaioannou reviewed the PIP with Bagwe. At one point the meeting became confrontational, with both Bagwe and LeClaire raising their voices as Bagwe attempted to debate the merits of the PIP, while LeClaire expected her to listen to the feedback and reflect on it. (*Id.*)

There is no dispute that Bagwe was not issued a PIP due to any failure to perform the technical aspects of her job. Rather, the PIP focused on her interpersonal, communication and leadership skills, all of which were

considered critical aspects of her performance. (R.162, ¶42; 145-18, pp.28-31.) Among other things, Bagwe's complaints about Coyle's allegedly racial remarks were raised in the PIP, not because the complaints were made, but because Bagwe brought up the issue only when confronted about problems with her own performance. (*Id.*) Papaioannou, LeClaire, and French all stated that they expected management level employees in particular to bring up such allegations right away. (*Id.*)

The purpose of the PIP was to assist Bagwe in improving her performance, and the format used and the manner in which it was conveyed were specifically designed to be as cooperative, supportive and non-threatening as possible. (R.144, ¶44.)  As part of her PIP, Bagwe was required to attend leadership training in late April 2009 and to meet weekly with Papaioannou to discuss her progress. Neither Bagwe's pay, nor her job duties, nor her title were changed as a result of the PIP or because she had to go to leadership training. (*Id.*)

## C. Bagwe's Response to the PIP

On April 1, 2009, Bagwe presented Papaioannou, Street, and Simpson with a written response to her PIP, including an 18 page Memorandum and a binder full of supporting documentation. (R.162, ¶45.) The memorandum does not allege that the PIP was issued to her based on her race or national origin, or in retaliation for her earlier complaints. (*Id.*)

LeClaire, Papaioannou and Street all reviewed Bagwe's response. (R.144, ¶47.) LeClaire and Papaioannou concluded that the rebuttal did not change their conclusion and the PIP would stand. (*Id.*) Between 2005 and 2009, Sedgwick did not have a policy requiring a supervisor to specifically address each fact or allegation presented by an employee in response to a PIP, nor has it been a consistent practice for any of the supervisors managing the AT&T work to do so. (*Id.*)

### IV. Plaintiff's 2009 Complaints

### A. Bagwe's First Complaint of Discrimination

On April 3, 2009, Simpson received a written complaint from Bagwe, which was the first time Bagwe complained that she was subject to adverse treatment based on any protected category. (R.162, ¶50.) Bagwe does not mention her race or national origin, but complains of "discrimination, harassment, bullying and hostile work environment." (R.145-18, p.50 (p.1 of doc.).) She claims that her PIP was issued, and that she was mistreated during the meeting in which her PIP was presented as a result. (*Id.*) For example, she complains that she was told that the reasons for her PIP were "subjective" and that she was told by LeClaire, "you think you are good but you are no good." (*Id.*) She also claims that the adverse treatment related to her PIP was in retaliation for her 2008 complaints about compensation. (*Id.*, p.50-51 (pp.1-2 of doc.).) She went on to complain about Coyle's alleged remarks about other

employees' race and sexual orientation, and the incident that occurred in January 2009 with French and Coyle. (*Id.*, p.51 (p.2 of doc.).)

## B. Bagwe's Follow-Up Complaint

On May 1, 2009, while her earlier complaint was still pending, Bagwe contacted Street to raise additional allegations. Bagwe alleged that, during a meeting earlier in 2009, she overheard Coyle state to Rick Hernandez, "that's why I don't live in Pilsen," and that when Hernandez asked Coyle what she was talking about, she used the term "your people." (R.144, ¶66.) However, Bagwe explained to Street that she did not hear the context of the conversation because she was reviewing her notes. (*Id.*)

Street investigated by speaking with Warner, Hernandez and colleague Ramos. (R.144, ¶66.) All three explained the context of the remark, and stated that it was not offensive, racial or discriminatory. (*Id.*) French and LeClaire were both open to CR's recommendations as to how to handle the situation, even if that meant terminating Coyle. (R.144, ¶67.) Nevertheless, Street concluded that Coyle had not violated Sedgwick's EEO policies. However, based on Street's recommendation, on May 15, 2009, French met with Coyle to discuss the need for her to be more sensitive in her communications with colleagues. (R.144, ¶68.)  French also sent an email to Street noting that "additional feedback and coaching will be provided to [Coyle]." (*Id.*)

## C. Stephanie Simpson Concludes the Investigation

Simpson interviewed Warner, Hernandez, Ramos, Mark DeBus, Coyle, French, Papaioannou, and LeClaire in order to investigate Bagwe's April 3rd complaint. (R.144, ¶50.) Simpson interviewed these witnesses in order to investigate Bagwe's claims, as well as to fully understand what was occurring in the office and the relationships among the personnel. (R.163-6, p.14 (pp.69-71 of transcript).)

Simpson first addressed Bagwe's complaint about not receiving a raise when she functioned as the Interim Operations Manager III in 2007 while Simmons was in California. (R.144, ¶19.) Simpson did not understand this complaint to be part of Bagwe's claim of discrimination. (R.144, ¶20.) After consultation with LeClaire, Simpson found that this complaint was unfounded. (R.144, ¶21.) Three other Sedgwick employees – Betz, Corrine Doran and Jason Dooley (all White Americans) – also performed more than one role at a time on an interim basis at various points in their careers, and none received additional compensation for their additional job duties. (R.162, ¶52.) Regardless, at the conclusion of her investigation, Simpson recommended that Bagwe receive a $5,000 spot bonus for her interim manager work. (R.162, ¶53.)

Next, Simpson investigated Bagwe's complaint about an insufficient pay raise in 2008. (R.162, ¶51; 145-12, p.21.) Simpson found that Bagwe's salary was justified by her service time after comparing her to Lanier, who had been an Operations Manager for approximately 4 years longer than Bagwe. (*Id.;*

R.162, ¶ 6.) Furthermore, LeClaire, who Simpson consulted, testified that Betz's salary took into account his work history, relocation and additional responsibilities. (R.162, ¶76.)

After her investigation, on June 15, 2009, Simpson completed a summary report, concluding that, based on objective salary data, Bagwe's compensation was fair and therefore did not recommend any change, other than the $5,000 spot bonus. (R. 144, ¶69.) Simpson also recommended providing formal documentation to Coyle to express the need for communication improvement and for professionalism in the workplace. (*Id.*) Consistent with Street's findings, Simpson also concluded that Coyle had not intentionally engaged in any discriminatory conduct, but that her conduct could leave her co-workers with a negative perception of her style. (*Id.*) Simpson also recommended, among other things, that French, Papaioannou and LeClaire evaluate their own interaction styles and that French formally address Coyle's inappropriate interactions. (*Id.*) Simpson met with Bagwe on June 17, 2009 to relay the outcome of her investigation, including her recommendations. (*Id.*)

Nevertheless, on June 22, 2009, Bagwe emailed Simpson to reiterate for the third time her compensation concerns, referencing a spreadsheet of compensation comparisons. (R.144, ¶70.) After meeting with Bagwe on June 17, 2009 to discuss her allegations, Simpson forwarded a salary report to her supervisor, Rachel Jackson (African American). (*Id.*) Jackson asked another CR representative to provide accompanying demographic information for the salary

21

report so that she could fully review Bagwe's complaint. (*Id.*) After reviewing both reports, Jackson advised Simpson to inform Bagwe that the close-out letter was final and that if she had any further questions Bagwe could call Simpson. (*Id.*) When Simpson conveyed this message to Bagwe, Bagwe indicated yet again that she would like to meet to continue the discussion that she was being discriminated against with respect to compensation. (*Id.*)

On July 28, 2009, Simpson drafted a close-out letter to Bagwe stating that there was no evidence of tangible pay inequity. (R.144, ¶71.) Simpson waited to close-out the investigation until after Jackson returned from PTO and was able to discuss Bagwe's compensation concerns. (*Id.*)

### V. Bagwe's Termination

On the morning of July 16, 2009, Simmons ran into Warner in the lobby of the Chicago office. Warner was very upset and crying. (R.162, ¶84.) She described her email exchange with Bagwe of earlier that morning, and alleged that Bagwe was harassing her. (*Id.*) Specifically, Bagwe and Warner had been in a heated email exchange after Warner cancelled a previously scheduled meeting. (R.144, ¶83.) At some point, Warner stopped responding to Bagwe's emails because of their tone. (*Id.*)

Simmons called LeClaire that morning to relay the information. (R.162, ¶84.) LeClaire spoke to Warner later that day, as Papaiannou was on vacation in Greece. (R.144, ¶85.) Warner told LeClaire that she was concerned that Bagwe was trying to get her fired. Warner expressed to LeClaire that her

conflicts with Bagwe had escalated while Papaioannou was out and that she was worried about her job. Warner explained that the confrontational emails from Bagwe were a constant problem. (*Id.*) LeClaire was especially troubled because they were exchanging emails despite the fact that their offices were right next to one another. (R.144, ¶86.) LeClaire decided to wait until Papaioannou's return to take any action. (*Id.*) In the interim, Warner forwarded to LeClaire, who then forwarded to Simpson, Street and Papaioannou, a series of emails between Warner and Bagwe in which their confrontation escalated. (R.144, ¶86.)

On July 29, 2009, after she returned from Greece, Papaioannou spoke to Bagwe to discuss how the July 16th situation involving Warner was handled. (R.144, ¶¶87-88.) Papaioannou believed that Bagwe had handled the July 16th email exchange appropriately, insofar as Papaioannou had instructed Bagwe to speak to her colleagues in person, and if that did not work, to make Papaioannou aware of the situation. (R.144, ¶88.) However, when Bagwe was unable to meet with Warner in person, she made Papaioannou (who was in Greece) aware of the situation via email. (*Id.*) Papaioannou believed that Bagwe should have instead approached LeClaire directly for help on July 16th. (*Id.*)

The incident with Warner was not the only issue that arose while Papaioannou was in Greece. On July 14, 2009, another of Papaioannou's subordinates, Dooley, described some of Bagwe's emails, stating, "They are seriously killing me. Non-stop today…Trying to justify job. Fear…I want to

reply so bad right now to Ratna's email but don't want to overstep my boundaries so please tell me not to. [sic]." (R.144, ¶89.) Papaioannou also testified that "everybody individually" on her team had told her they were "tired of all the emails that were coming out…a lot of email war debates." (*Id.*) She went on to explain that whoever would attend their weekly team meetings "would get tired of getting 100 emails on one topic." (*Id.*) Even after the July 16, 2009 incident, Warner described Bagwe's emails to Papaioannou by saying "it just never ended." (*Id.*)

Upon Papaioannou's return, LeClaire consulted with her about the incident involving Warner and Bagwe's overall performance over the course of the previous two years as well. (R.144, ¶87.) LeClaire felt that the email communications between Bagwe and Warner on July 16, 2009 showed that Bagwe's communication and leadership skills had not improved. (R.144, ¶92.) LeClaire was also concerned about the other incidents in which Bagwe would have in-person conversations with individuals, and then return to her desk and send numerous confrontational or questioning emails. (*Id.*) She noted that this caused colleagues, such as Papaioannou, Simmons, Warner, French and Coyle, to avoid communicating with her because they were uncomfortable doing so. (*Id.*) LeClaire felt that when she had attempted to discuss the issues with Bagwe, she was met with defensiveness and excuses instead of reflection and acceptance of constructive feedback. (*Id.*)

LeClaire decided that, based on everything that had occurred over the previous two years, Bagwe's ability to provide leadership to her team was not effective and it was not going to improve. (R.144, ¶93.) LeClaire asked Papaioannou for her opinion on whether Bagwe should be terminated, and, ultimately, they agreed that LeClaire should recommend terminating Bagwe. (R. 144, ¶¶93-94.) Both Johnson and Browne were consulted regarding this decision. (R.144, ¶97; 145-6, pp. 5-6 (transcript pp.68-69).) Browne was required to approve all terminations at the time. (R. 144, ¶96.) Both Johnson and Brown agreed termination was warranted. (R.144, ¶97; 145-6, pp. 5-6.)

On or about August 3, 2009, Rachel Jackson confirmed her plans to travel to Chicago to attend the August 14, 2009 termination meeting with Bagwe. (R. 163-56.) In the interim, Papaioannou discovered additional information that fully supported the termination decision. On August 4, 2009, Hernandez reported to Papaioannou that Bagwe's leadership style could be retaliatory, and that there were email wars when things were not done Bagwe's way. (R.162, ¶90.) Hernandez specifically referred to two examples when Bagwe and Warner engaged in "childish behavior." (*Id.*) Based on her discussion with Hernandez, Papaioannou concluded that Bagwe was responsible for the "childish behavior" during these incidents. (*Id.*) Around the same time, Papaioannou spoke with Ramos, another one of Bagwe's colleagues, who told Papaioannou that she thought communication issues between Bagwe, French and Coyle were creating

issues with the workers' compensation team.  (R.144, ¶91.)  These conversations verified that Bagwe's leadership and interpersonal issues were ongoing. (*Id.*)

Prior to Jackson traveling to Chicago, Papaioannou sent Jackson an email summarizing the reasons for the termination.  (R.144, ¶98.)  LeClaire also spoke with Jackson to discuss the logistics of the termination such as who would be present at the meeting, and what Bagwe would be told, among other things. (*Id.*)

Consistent with Sedgwick's procedures for terminations at Bagwe's level, Jackson and Street met with Bagwe for her termination on August 13, 2009. (R.144, ¶98.)  Consistent with the usual policies for employees involuntarily terminated from Sedgwick's Chicago office, Bagwe was not allowed to return to her desk following the termination meeting. Instead, Street escorted her to the elevator and later packed up her personal belongings and had them delivered to Bagwe. (R.144, ¶100.)

Bagwe claims that, on August 13, 2009, before she was terminated, she stopped by Papaioannou's office to say hello. (R.162, ¶101.) According to Bagwe, after walking away, Bagwe turned back to ask her whether she was going to join an upcoming meeting. (*Id.*) Bagwe claimed that when she did so she overheard Papaioannu use the words "Indian bitch." (*Id.*) Bagwe claims she was four or five feet away from Papaioannou at the time and Papaioannou was sitting in a chair facing towards the door of the office, but Bagwe was outside the office, facing away from Papaioannou's office door. (*Id.*) Bagwe did not hear

Papaioannou say anything else, although Bagwe testified that it is possible Papaioannou said more that she did not hear. (*Id.*)[3]  Bagwe did not report the remark to any human resources personnel that day. Rather, the first time she mentioned the remark to anyone at Sedgwick was to Jackson, two or three days after her termination. (R.144, ¶101.)

## VI. Bagwe's Replacement

After a competitive posting process, Bagwe's former position was filled by Gary Enneking (White American). (R.162, ¶104.) However, it became apparent that he did not have the initiative or desire to learn the disability program, despite that Papaioannou spent considerable time training him. (*Id.*) Enneking also had leadership issues. Specifically, his subordinates did not feel they could go to him for advice, did not feel he could provide them with any direction because he did not have the required technical knowledge, and did not trust him. (*Id.*) Enneking also failed to adequately learn the technical aspects of LTD claim management, and he once settled a workers' compensation claim outside his authority to do so. (*Id.*) Papaioannou counseled Enneking and worked with him for a period of time less than one year before recommending termination to Street. (*Id.*) In reality, even if Enneking had not settled the case outside his authority, and even if he had a good command of the technical aspects of his job, he would still have been terminated due to his other failings. (R.144, ¶104.)

---

[3] Papaioannou denies calling Bagwe a "bitch" or "Indian bitch" at any point in time. (R.144, ¶101), and the other Defendants deny – and have always denied – Bagwe's allegation as well.

Street agreed with the recommendation, and presented the case to her supervisor, who approved. (R.162, ¶104.) Enneking was terminated on September 21, 2012, and following his termination meeting, he was not allowed to return to his desk. Instead, Street later packed his belongings and shipped them to him. (*Id.*) Warner (African-American) replaced Enneking. (*Id.*)

## VII. Post-Termination Events

After her termination, Bagwe worked at Career Education Corporation ("CEC"), Northwestern Memorial Hospital ("NMH") and Liberty Mutual. (R.144, ¶105.) She was terminated for cause by CEC and NMH due to similar performance deficiencies such as her failure to communicate, preoccupation with other employees' performance and disciplinary issues, failure to accept constructive criticism, defensive behavior, and engaging in improper "email wars." (*Id.*) At both CEC and NMH, Bagwe made the same excuses that she did at Sedgwick, including inadequate staffing and under-skilled supervisors. (*Id.*) She complained about unlawful discrimination, harassment and/or retaliation at all three of these subsequent employers. (*Id.*)

Sedgwick's policy is only to provide verification of employment if the company is contacted for a reference for a former employee. No subjective information is given. Sedgwick maintains a support center that fields all such calls. If a request for a reference is received by another employee, he or she is required to forward the request to the service center. This policy and practice was in place at all times between 2009 and the present. (R.144, ¶106.)

Bagwe claims that Sedgwick interfered with her attempts to get a job with Matrix Absence Management. (App. Br. 20.) However, Bagwe is unaware of the identities or qualifications of any of the other applicants for positions with Matrix. (R.162, ¶109.) Nevertheless, Bagwe claims she was recruited for a job but was denied it when an unnamed Sedgwick employee told the CEO of Matrix that she was a "problem." (R.162, ¶108.) Bagwe's sole support for her allegation is the declaration of Kristi Pease, a former Matrix employee, that relates to an email describing a conversation the CEO allegedly had. Pease claims that, in either late 2009 or early 2010, she interviewed Bagwe for a management position. (R. 163-59, ¶¶5-6.) However, after a phone interview and telling Matrix's CEO that she wanted to hire Bagwe, Pease claims the CEO emailed her saying that he had just spoken with a Sedgwick employee and she could not hire Bagwe. (*Id.*, ¶8.) Pease claims that the CEO relayed via his email that the Sedgwick employee stated that Bagwe had been a good performer, but became "a problem" after she was promoted. (*Id.*)

## Summary of the Argument

Just as she did before the District Court, Bagwe urges this Court to forgo the established framework for analyzing discrimination and retaliation claims, and instead focus solely on the question of whether a reasonable jury could find in her favor. The precedent on this point is clear – the familiar direct and indirect methods of analysis should be applied, and Bagwe's failure to organize her argument and facts in accordance with this framework leaves the Defendants and Court guessing as to what exactly Bagwe is arguing.

Nevertheless, it is apparent that Bagwe lacks circumstantial evidence of either discrimination or retaliation. Her claims also necessarily fail under the indirect method of proof, as she could not identify a similarly situated individual who was treated more favorably, and a close inspection of the record negates each of Bagwe's claims that allegedly constitute evidence of pretext.

Bagwe's strategy has always been to throw as many allegations against the wall as possible to see if enough stick to get her past summary judgment. The District Court carefully analyzed the actual evidence in support of these allegations – despite being hamstrung by Bagwe's failure to organize her arguments logically – and correctly concluded that they simply do not hold water, and no reasonable jury could find that any of the Defendants discriminated or retaliated against Bagwe. This Court should affirm the District Court's grant of summary judgment in favor of the Defendants in full.

**Argument**

I.  Bagwe Stubbornly Refuses to Follow the Established Framework for
Analyzing Discrimination and Retaliation Claims

Discrimination claims brought under Title VII, § 1981 and the Illinois
Human Rights Act ("IHRA") are all analyzed under the same framework. (Order
p.8, citing *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 442 (7th Cir.
2014).) They may be proven by either the direct or indirect methods of proof. Under
the direct method, Bagwe must proffer either direct or circumstantial evidence of
discrimination. *Tank v. T-Mobile USA, Inc.*, 785 F.3d 800, 805 (7th Cir. 2014).
"Direct evidence requires an admission of discriminatory intent, while
circumstantial evidence typically includes: (1) suspicious timing, ambiguous oral or
written statements, or behavior toward, or comments directed at, other employees
in the protected group; (2) evidence, whether or not rigorously statistical, that
similarly situated employees outside the protected class received systematically
better treatment; or (3) evidence that the employer offered a pretextual reason for
an adverse employment action." *Id.*

In the alternative, Bagwe can proceed under the indirect method, whereby
she would first need to establish a prima facie case of discrimination by showing,
"(1) [s]he is a member of a protected class; (2) [s]he met the employer's legitimate
business expectations; (3) [s]he suffered an adverse employment action; and (4)
similarly situated employees outside of the protected class were treated more
favorably." *Tank*, 758 F.3d at 809. If she succeeds in doing so, Defendants must
proffer "a legitimate, nondiscriminatory reason for the employment action," which

Bagwe would then need to establish is pretextual in order to survive summary judgment. *Id.* To show pretext, Bagwe must establish that the proffered reasons are "unworthy of credence" by showing that they are "factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Id.* at 807.

To establish her retaliation claims brought under Title VII, § 1981 and the IHRA, Bagwe must also proceed under either the direct or indirect methods of proof. Under the direct method, Bagwe must show "(1) [s]he engaged in a protected activity; (2) [Sedgwick, LeClaire and/or Papaioannou] took an adverse employment action against [her]; and (3) there was a causal connection between [her] protected activity and the adverse employment action." *Tank,* 785 F.3d at 807. Here, an adverse action is anything that would dissuade a reasonable employee from complaining about discrimination. *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Under the indirect method, Bagwe must establish a prima facie case by showing (1) she engaged in protected activity; (2) she met the employer's legitimate business expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who did not engage in protected activity were treated more favorably. *See Hutt v. Abbvie Products LLC*, 757 F.3d 687, 694 (7th Cir. 2014).[4]

---

[4] Defendants argued at summary judgment that although Bagwe sometimes refers to "harassment" in her Complaint, she has not sufficiently pled a harassment claim. (R.143, p.24.) Bagwe not only failed to raise a harassment claim at summary judgment, but she completely fails to raise the issue on appeal. Bagwe has therefore waived any harassment claims. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651,

Bagwe eschewed this well-established framework both at summary judgment and on appeal. Bagwe instead spilled a lot of ink arguing that the direct and indirect methods of proof should be either collapsed or abandoned altogether in favor of the more general standard, "whether a reasonable jury could find unlawful discrimination or retaliation." (R.160, p.8-9.) Bagwe is correct that the ultimate inquiry is whether a reasonable jury could find in her favor. However, the proper framework for answering this question remains the analysis described above. In fact, this Court has recently and consistently applied this framework. *See, e.g.,* *Tank*, 758 F.3d at 805-810; *Hutt*, 757 F.3d at 691-694.

Bagwe also fails to differentiate between arguments made in support of her discrimination and retaliation claims. Instead, she makes the blanket statement that "[v]irtually all of the forgoing evidence…is evidence on which Bagwe can rely to establish her retaliation claim as well as her discrimination claim." (App. Br. 50). Not only is this an underdeveloped argument that offers essentially no explanation for its conclusion, it simply does not make sense. For example, events that take place prior to the first protected activity cannot possibly be asserted in support of her retaliation claim.

Bagwe claims the District Court became "confus[ed] over the application of the 'direct' and 'indirect" methods of proof." (App. Br. 24). In reality, the District Court did its best to apply the arguments and evidence raised by Bagwe to the

---

654 (7th Cir. 2010); *Egan v. Freedom Bank*, 659 F.3d 644-645 (7th Cir. 2011) (issues not raised in opening brief are waived); *Hutt*, 757 F.3d at 692 (indirect method of proof waived when not raised).

framework described above. This Court is faced with the same challenge on appeal, because Bagwe has again failed to organize her arguments according to the direct/indirect framework.

## II. The District Court Correctly Dismissed Bagwe's Discrimination Claims.

Bagwe claims the Defendants discriminated against her based on her race and national origin. She specifically testified that Defendants' animus was not just directed at Indians, but rather towards all non-Whites and non-Americans. (R.162, ¶3.) The District Court's decision dismissing these claims must be upheld because Bagwe cannot make out her case under either the direct or indirect methods.

### A. Bagwe Cannot Make Out a Case Under the Direct Method.

There is no direct proof of discrimination or retaliation. As a result, Bagwe must rely on circumstantial evidence under the direct method of proof. Bagwe argues that two alleged comments made by Papaioannou and LeClaire constitute circumstantial evidence of race discrimination. (*See* Order pp. 31-34.) Because both comments are "stray remarks" that do not rise to the level of circumstantial evidence of discrimination, Bagwe's claims under the direct method of proof must fail.

#### 1. Papaioannou's Alleged Comment Was Not Circumstantial Evidence of Discrimination.

Bagwe proffers only one piece of evidence in support of her claim that Papaioannou discriminated against her due to her race or national origin. She alleges that on the day of Bagwe's termination, as Bagwe was walking out of Papaioannou's office, she heard Papaioannou mutter the phrase "Indian bitch"

under her breath.   (R.162, ¶101.) The District Court correctly found that this remark, even if made, was not evidence of discriminatory animus. (Order pp.32-34.)

In her brief, Bagwe devotes nearly three pages to arguing that there is no stray remarks "doctrine." (App. Br. 28-30). Regardless of whether it is a "doctrine," there is no doubt that not all such remarks are circumstantial evidence of discrimination. As recently as July 2014, this Court in *Tank* articulated the long-established standard for determining whether a racial remark can be considered evidence of discrimination. Specifically, the remark must be, "(1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." 785 F.3d at 806 (internal quotation omitted).

Here, there is no dispute that Papaioannou was a decision-maker. Bagwe claims that the remark can be tied to her termination because it was made on the same day, and that a jury could therefore infer that Papaioannou had Bagwe's termination "on her mind" when she made the remark. (App. Br. 32.) However there is absolutely no evidence to support this inference. Although Bagwe is entitled to all reasonable inferences in her favor, those inferences must have some support in the record, as the District Court correctly ruled. (Order p.2, citing *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).)   Bagwe's testimony is clear that the conversation between her and Papaioannou was a casual conversation that had nothing to do with *any* aspect of her employment. (R.144, ¶¶93-94,96-97,98,101.) Therefore, the only remaining question is whether the remark was made around the time of the decision.

The inquiry into whether the temporal relationship between a racial remark and an employment decision is sufficient to constitute circumstantial evidence depends on the facts of the case. *Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2003). Each case cited by Bagwe is distinguishable. For example, in *Perez,* the plaintiff was terminated for selling discounted candy to herself in violation of company policy. The plaintiff's regional manager was aware that plaintiff's general manager, who had made the discriminatory remark in question, harbored a bias against plaintiff's race and sex, yet still he credited the general manager's account instead of plaintiff's account of the incident that led to plaintiff's termination. 731 F.3d at 708-09. In *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.,* 344 F.3d 680, 683 (7th Cir. 2003) (cited in App. Br. 33), the plaintiff overheard a decision-maker say "keeping them barefoot and pregnant" immediately after she was told that she did not receive a promotion. This Court held that the comment was not just derogatory towards women, but it specifically communicated an intent to keep women out of the workplace. It was therefore both "close in time and substance" to the adverse action in this sex discrimination case. *Id.* at 690. In contrast, there is literally no other evidence that Papaiannou harbored a bias against non-Whites or non-Americans, and the alleged remark is not tied in any way to Bagwe's termination.

Bagwe mischaracterizes the District Court's opinion by claiming that it required that the remark in question be made during a conversation about a protected category, which Bagwe claims amounts to requiring direct evidence. (App.

Br. 33-34). The District Court actually relied on the fact that the alleged comment was made well after Papaiannou's involvement in the termination decision was over, as opposed to either during a discussion of the decision or prior to the decision being made. (Opinion p. 33-34.) It also relied heavily on the fact that there is no other evidence that Papaioannou – who is sued in her individual capacity and whose actions must therefore be analyzed independently of those of her co-workers – harbored a bias against Bagwe. (*Id.*)

Notably, this Court has affirmed summary judgment in similar situations in the past. For example, in *Overly v. Keybank Nat'l Ass'n*, this Court affirmed summary judgment despite plaintiff's allegation that, upon receiving her resignation, she was pushed to door and told "good riddance bitch" in a loud voice by her supervisor. 662 F.3d 856, 862 (7th Cir. 2003). The Court found that additional evidence would be required to show this was a confession that earlier adverse action was taken for discriminatory purposes, as opposed to a general expression of hostility. *Id.* at 865. This Court also determined that the alleged comment was not circumstantial evidence of discrimination because it was made after the adverse action, and was not made in reference to the adverse action. *Id.*

Bagwe continually complains that the District Court impermissibly drew inferences in Papaioannou's favor by holding that the alleged comment was a stray remark. In reality, no inference one way or another is necessary. Rather, the alleged remark simply is not sufficient to survive summary judgment in the absence of any

additional evidence that Papaioannou harbored any bias against Bagwe's race or national origin.

### 2. LeClaire's Comment About Bagwe's Husband Also Is Not Circumstantial Evidence of Discrimination.

Next, Bagwe complains that two years prior to her termination, while she was at a bar the night before a work meeting with LeClaire and Coyle, LeClaire urged Bagwe to get rid of her "old Indian husband" because "white men are more fun." (R.144, ¶64.) Bagwe acknowledged that the three were discussing LeClaire's then-pending divorce, it was entirely casual, and no one discussed any aspect of their respective jobs during the conversation. (*Id.*) Nevertheless, Bagwe attempts to argue that this comment is circumstantial evidence of discrimination. (App. Br. 35-36.)

Bagwe relies on four cases to support her claim, yet each one is distinguishable or unhelpful. In *Perez v. Thorntons, Inc.*, the plaintiff's supervisor actually stated to her "this is the reason why I don't like to work with women, always have something to do with the kids or they have a period." He also told her that he "did not like" Hispanics. 731 F.3d 699, 701 (7th Cir. 2013). In *Shager v. Upjohn*, 913 F.2d 398, 402 (7th Cir. 1990), and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), there was substantial, objective and detailed evidence that the plaintiffs had met the defendants' legitimate performance expectations and that the alleged performance issues were fabricated. Finally, both *Reeves* and *Ash v. Tyson*, 546 U.S. 454 (2006), provide the type of factual background regarding the alleged comments to permit the type of fact-based

comparison required in these situations. Furthermore, the allegation against LeClaire does not even come close to meeting the standards for circumstantial evidence articulated in *Tank*, as the remark occurred two years prior to her termination, and had absolutely nothing to do with any aspect of Bagwe's employment.

**B. Bagwe Cannot Establish Her Discrimination Claims Under the Indirect Method.**

**1. Bagwe Was Not Meeting Legitimate Performance Expectations.**

On appeal, Bagwe claims that she was meeting Defendants' legitimate performance expectations because "objective" measures, such as financial metrics and survey results, indicated that she and her team were performing well. (App. Br. 8,41.) Defendants have consistently asserted that Bagwe was not meeting performance expectations in the areas of leadership and communication, not metrics and surveys. (R.144, ¶42.) For example, no less than *nine* individuals (Anne Coyle, Charles French, Angela Papaioannou, Tammy LeClaire, Rick Hernandez, Delaine Simmons, Tobin Beckerman , John Dooley and Tonya Warner) have complained about Bagwe's combative and defensive communication style, particularly via email. This list includes Plaintiff's supervisors, peers and subordinates. (R.144, ¶¶33,37,89-90,92.) It includes her mentor, who Bagwe testified was a person of integrity, free of racial bias, and who has not discriminated against her. (R.144, ¶27.) It also includes Hispanic, Italian, African-American and Greek employees.  The complaints date back to Simmons' formal complaint against her in 2008, and span all the way until Dooley's and Warner's complaints just weeks before her termination. Bagwe has not argued or offered any

evidence that getting along with co-workers is *not* a legitimate performance expectation, so there can be no question that Bagwe has failed to meet this prong of the *prima facie* case.

### 2. Bagwe's Termination Is the Only Adverse Action.

Based on the applicable standard, the District Court held that the only adverse action that Bagwe suffered with respect to her discrimination claims was her termination. (Opinion p.21.) Bagwe has not taken issue with this finding.

### 3. Bagwe Cannot Identify Any Similarly Situated Individuals Who Were Treated More Favorably.

Bagwe has identified three individuals who were potentially similarly situated to her, and who she claims were treated more favorably – Enneking, her replacement, and Betz and Lanier, other Operations Managers III working on the AT&T account under LeClaire and Papaioannou. (*See* App. Br. 5,48-50.)

"To show that co-workers are similarly situated, [a plaintiff] must demonstrate that the putative similarly situated employees were directly comparable to him in all material respects. [Citation omitted.] This requires [the plaintiff] to show that he and an alleged comparator 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' [Citation omitted.]" *Tank*, 785 at 808-09.

With respect to pay claims[5], a plaintiff must establish that comparators "were subject to the same standards and compensation scheme, or had comparable experience, education, or qualifications." *Tank*, 785 F.3d at 810. A plaintiff cannot avoid summary judgment simply by establishing that purported comparators held the same position as did the plaintiff but were paid more. *Id.* Critically, in order to survive summary judgment, it is clear that it is Bagwe's burden to identify possible comparators and establish that they are both similarly situated and were treated more favorably.

a. Enneking Was Not Treated More Favorably than Bagwe.

In *Tank*, the plaintiff alleged that two comparators were treated more favorably because the defendant did not take action against them when serious allegations of policy violations by the comparators arose. 758 F.3d at 808. Similarly, Bagwe complains that Enneking was treated more favorably because, like Bagwe, he also had performance deficiencies surrounding communication, leadership and interpersonal relations, but was not terminated for these issues. Rather, he was only terminated after he made the egregious error of settling a case outside his authority. (App. Br. 48.)

In *Tank,* this Court found that the individuals identified by the plaintiff were not comparators because, neither engaged in the litany of misconduct in which Tank engaged. 785 F.3d 808-809. Similarly, Bagwe's interpersonal issues dated

---

[5] Bagwe repeatedly claims that Defendants failed to raise a defense on the merits to Bagwe's claims of pay disparities. (*E.g.,* App. Br. 54.). For the reasons described in Section IV.A. below, this argument is entirely unsupported by the record.

back at least to her confrontation with Simmons – her trusted mentor – two years prior to her termination. (R.144, ¶25.) Furthermore, Bagwe was not only informally counseled but later formally placed on a PIP that was specifically designed to help her improve her behavior and not be punitive. (R.144, ¶¶40-44.) On the other hand, Enneking was fired after less than a year without the benefit of a PIP. (R.162, ¶104.)  In other words, the District Court's ruling that Enneking was not treated more favorably than Bagwe is entirely uncontroverted by the record.

> b.  Enneking, Betz and Lanier Were Not Comparable to Bagwe.

Bagwe has not proffered any evidence regarding Betz's, Lanier's or Enneking's prior job history, qualifications, or education to meet her burden of proving they are similarly situated. (*E.g.,* Dkt. 145-15, p.42 (transcript p.212).) It is therefore clear that she could not possibly meet her burden of establishing that any of the three of them are proper comparators for purposes of her pay claims. On the other hand, Defendants have established compelling evidence that Bagwe was not comparable to Betz or Lanier.

Betz's pay was higher than Plaintiff's because, at the time he was promoted to Operations Manager III, Betz had experience as an accounts manager as well as an operations manager, which Bagwe did not. (R.162, ¶74.) The pay raise Betz received also reflected his relocation and the increased responsibility in his new position. (R.162, ¶76.)

Lanier's and Enneking's backgrounds are not comparable to Bagwe's. Lanier had four years more experience in the Operations Manager III position than did

Bagwe. (R.162, ¶¶6-7,112.) Enneking had operations management experience when he was hired, whereas Bagwe did not. (R.162, ¶104.)

In short, the fact that Betz, Lanier and Enneking all held the same position as Plaintiff is insufficient for her to survive summary judgment because there are ample differences in Betz's, Lanier's and Enneking's skills, background and experience.

4. There Is No Evidence of Pretext.

Only two of Bagwe's allegations can be read to support her claim that Defendants' proffered reasons for taking the only adverse action at issue – her termination – are pretextual[6].

a.  The Scope of the Investigation into Bagwe's 2009 Complaints Was Reasonable.

First, Bagwe complains that following her April 2009 complaint, Simpson not only investigated her complaints, but also investigated Bagwe. (App. Br. 10-11.)

The District Court held that it was reasonable for Simpson to investigate not only Bagwe's complaints, but also the entire dynamic in the office and among Bagwe's co-workers. (Opinion p. 41.) Bagwe persists in arguing that a jury could also potentially find that the broader investigation was unnecessary and evidence an unlawful motive. (App. Br. 52-53.) In doing so, Bagwe ignores this Court's precedent that expanding a human resources investigation to include the conduct of the complaining party does not constitute evidence of an unlawful motive. *See,*

---

[6] To the extent Bagwe incorporates her allegations regarding the racial remarks into her pretext argument, Defendants reiterate their arguments for why those remarks cannot constitute evidence of bias against Bagwe's race or national origin.

*Tank,* 785 F.3d at 805 (nothing suspicious about timing of an investigation into plaintiff's conduct that was initiated just two days after plaintiff complained about unlawful discrimination).

> b.  Bagwe's Salary as Operations Manager III Was Justified.

Bagwe argues that, after taking into account geographic variations, she was the lowest paid Operations Manager III at Sedgwick, which she claims is evidence of pretext.

As described above, Bagwe's pay was justified as compared to her peers based on her record of service, prior work experience and skills, and the size and complexity of her job duties. There is simply no basis for drawing the conclusion that Bagwe's pay rate was evidence of pretext.

> c.  Other Evidence Affirmatively Demonstrates a Lack of Pretext.

Bagwe fails to mention a number of facts that directly refute an inference of pretext. For example, all three Defendants have routinely promoted non-Whites and non-Americans, such as Simmons and Warner. Similarly, Bagwe's claims include allegations that non-Whites, such as Warner, were treated more favorably than she was. Furthermore, LeClaire promoted Bagwe in 2005 and 2007 – the latter time over Bagwe's mentor's objections. *See Chiaramonte v. Fashion Bed Group, Inc.,* 129 F. 3d 391, 399 (7th Cir. 1997) ("when an employee is hired and fired by the same decision-maker in a relatively short time span, a presumption . . . of nondiscrimination arises.") In addition, the fact that Bagwe was terminated by two subsequent employers for nearly exactly the same interpersonal issues further

44

demonstrates that Defendants' justifications for termination were not pretextual. (R.144, ¶105.)

### III. The District Court Also Correctly Dismissed Bagwe's Retaliation Claims.

#### A. Bagwe Cannot Succeed Under the Direct or Indirect Methods of Proof.

1. Nothing Prior to February 2009 – the First Protected Activity – Can Be Evidence of Retaliation.

In order to establish her retaliation claim under the direct or indirect method, Bagwe must first show that she engaged in a protected activity. The first time Bagwe complained about discrimination was in January 2009, and that complaint was communicated to LeClaire and Papaiannou around February 25, 2009. (Opinion p. 42-43). Therefore, nothing that Bagwe complains about prior to February 2009 could possibly be considered evidence of retaliation. Notably, this includes the 2005, 2007 and 2008 pay decisions about which she complains.

The only possible exception to this statement is Bagwe's claim that she mentioned unlawful discrimination to Simpson in April 2008. (R.163-1, p.33.) Simpson neither understood the complaint to include discrimination, nor communicated to anyone else that it included discrimination, however. (R.144, ¶20.) Moreover, even if she did, there is no evidence that she told LeClaire or Papaiannou, as the District Court noted. (Opinion p. 43.)

2.  Bagwe's Termination Remains the Only Adverse Action.

Bagwe also must establish that she suffered an adverse action under both the direct and indirect methods. Just as with her discrimination claim, the only adverse action at issue is her termination.

a. Bagwe's PIP Was Not an Adverse Action.

Bagwe also appears to argue that her PIP constitutes an adverse employment action under her retaliation claim. (App. Br. 60.) However, this argument is undeveloped and lacks any citations whatsoever, in direct contravention of this Court's Practitioner's Handbook and F.R.A.P. 28(a)(8)(A). Instead, it argues without support that the PIP took the place of Bagwe's 2009 MAPP review, and that as a result, she was unable to receive a pay raise in 2009. Bagwe is not entitled to this inference because it is entirely unsupported by the record. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.") (internal quotation omitted).[7] Therefore, the District Court correctly held that Bagwe's PIP does not qualify as a materially adverse action even in the retaliation context. (Opinion p.37, citing *Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir. 2000).)

b. There Is No Evidence of Post-Employment Retaliation.

Bagwe's only evidence of post-employment retaliation is the affidavit of Kristi Pease (Dkt. 162, ¶108; 163-59), which states that, while she was in the process of

---

[7] Bagwe also states that when she was presented with the PIP, LeClaire told her not to tell anyone about the "fabricated write up." (App. Br. 7-8.)There is absolutely no evidence that LeClaire made this statement, and it certainly is not in the cited portions of the record.

potentially hiring Bagwe to work at Matrix Claims Management, the company's CEO emailed her, told her that he had "just" spoken to someone from Sedgwick, and that, based on that conversation, she was not to be hired because she was a "problem." (Order p. 38.) This "evidence" constitutes hearsay-upon-hearsay, lacks foundation and is therefore inadmissible and must be disregarded (Order pp. 38-40.)

Bagwe first tries to brush aside the true nature of the statement with a one sentence assurance that the statement is being offered only for the effect on the listener. (*See* App. Br. 47.) However, in order for the affidavit to be relevant, Bagwe must demonstrate that a Sedgwick employee actually contacted the CEO and called Bagwe "a problem." The truth of whether that statement was made is essential to her claim, and to hold otherwise would be nonsensical. Thus, the District Court correctly found that the statement is offered to prove the truth of the matter. (*See* Opinion p. 39, citing *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) ("Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged defamatory statement but was later told by another that the statement was made, such testimony is rejected as hearsay.").)

Second, the email itself is inadmissible hearsay despite Bagwe's failing assertion that the present sense impression exception of Fed. R. Evid. 801(1)[8] applies. (App. Br. 47-48; Order pp.39-40.) As the District Court correctly found, the email cannot fall under the exception because it is a "calculated narration" – to ensure Bagwe was not hired. (Opinion pp.39-40.) Bagwe's assurance that it was not

---

[8] Bagwe cites to "Fed. R. Evid. 803(c)(1)." No such subsection to Rule 803 exists, so Defendants presume she is referring to 803(1).

a calculated narration because it was a "nearly contemporaneous email about what a Sedgwick employee 'just' said" does not cut the muster. (App. Br. 47-48.) That the email purportedly included the word "just" provides absolutely no indication as to whether it was sent a few minutes, hours or days after the CEO spoke to the Sedgwick employee.

Third, the statements in the Pease declaration are inadmissible because they lack foundation in that they do not identify the Sedgwick employee who made the original statement. (*See* Opinion p.38.) Bagwe made no effort to address this holding on appeal and has waived her argument. *E.g., Egan*, 659 F.3d at 644-645.

Fourth, perhaps tacitly admitting the serious evidentiary issues she faces, Bagwe takes refuge in a claim that evidence need not be in a form that would be admissible at trial provided the facts could later be presented in an admissible form. (App. Br. 46-47.) However, there is no indication that the evidence could ever be admissible at trial, as Pease has not stated that she even has the email in question, Matrix's CEO has not been identified as a witness, and the Sedgwick employee who made the underlying statements is unidentified. (*See* Dkt. 163-59.)

3. There Is No Causal Link Between Protected Activity and Adverse Actions.

Under the direct method, Bagwe must establish a causal link between the protected activity (*i.e.* post- February 2009 complaints) and an adverse action (*i.e.* her termination). Bagwe does not specifically make a causal link argument, but Defendants assume that her claims about pretext are applicable to the causal link

argument as well. Defendant's responses to those claims are therefore articulated in Section III.A.5. below.

### 4. Bagwe Was Not Meeting Defendants' Expectations, and Has Not Identified a Similarly Situated Individual.

As stated in Sections II.B.1. and II.B.3. above, Bagwe has failed to establish that she was meeting Defendants' legitimate performance expectations, and she has failed to identify a similarly situated individual who was treated more favorably.

### 5. Bagwe Has Failed to Establish Pretext.

#### a. Papaiannou's Alleged "Warning" to Bagwe About LeClaire Is Immaterial.

Bagwe first alleges that in or around April 2008, Papaioannou "tried to tell [Bagwe] to be careful" in complaining about her compensation. (App. Br. 4-5.) The compensation complaint raised by Bagwe at the time, as well as the alleged comment, were made nearly one year before Bagwe engaged in any protected activity. Therefore, it could not possibly be evidence of pretext.[9]

#### b. Timing Issues Do Not Indicate Pretext.

Bagwe first claims the timing of her PIP is evidence of pretext. The only protected activity prior to the March 2009 PIP was Bagwe's complaints about Coyle's remarks[10]. First, the PIP was not an adverse action, but rather a counseling

---

[9] Bagwe also makes related allegations that LeClaire bullied her by pointing her finger at her or telling her that she is "no good." (App. Br. 9.) There is no evidence that any of these actions occurred prior to any protected activity.

[10] Bawge claims Coyle's supervisor, French, admitted that he was initiating a conflict with Bagwe around the time that Bagwe reported Coyle's remarks. (App. Br. 7.) This is another example of Bagwe misrepresenting the facts. French did not testify that he initiated a conflict, but rather testified that the "gloves are off"

without any negative ramifications. Second, if Defendants wanted to retaliate against Bagwe for complaining about Coyle, they could have terminated Bagwe instead of putting her on a PIP (just as Enneking was terminated after just a year of performance issues), or they could have ignored her allegations. Instead, the complaint was forwarded to CR, and Coyle was eventually counseled about the situation[11]. As the District Court pointed out, timing alone cannot establish pretext. (Order 43-44, citing *Nichols*, 755 F.3d at 605.)

Similarly, the timing of Bagwe's repeated complaints about her pay vis-à-vis her termination is not evidence of pretext. In 2008, Bagwe complained about her 2005 and 2007 compensation, so Sedgwick investigated the complaint and concluded that it was unfounded. She complained again in April 2009, and Sedgwick investigated again. When she complained again in June 2009 about the last investigation, Sedgwick investigated again. Nevertheless, Bagwe complained *again* in July 2009 about those same compensation decisions made up to four years earlier – decisions which she did not even claim were discriminatory until *after* she was placed on a PIP. (Dkt.144, ¶¶10,19-21,50-54,69-71.) If Defendants intended to terminate her for complaining, they could have done so long before August 2009.

---

because Bagwe had raised issues with him in a combative manner. (R.163-10, p.5 (transcript p.108).)

[11] Bagwe disputes whether Coyle was ever counseled, but the cited portions of the record do not support her assertion. (App. Br. 10-11.) Rather, they summarily state that the actions are in dispute. This is just one more example of an unsupported claim based on inaccurate citations to the record.

In short, Bagwe's myriad complaints, which were bound to occur close in time to some sort of protected activity given their sheer number, cannot create an inference of pretext.

### c.  Bagwe's 2009 Compensation Is Not Evidence of Pretext.

Bagwe claims that she did not receive a MAPP score in 2009 because she was placed on a PIP. She speculates that as a result, she did not receive a pay raise in 2009. As described above (*e.g.*, Statement of the Case Sections III-IV ) and the Opinion (p.21), there is no factual basis for this argument, and as a result it has no merit.

Bagwe also claims that the fact that she was the lowest paid Operations Manager III on the AT&T account, after taking into account geographic variables, establishes pretext. (App. Br. 58-59.) As described above (*e.g.*, Statement of the Case Sections  III-IV) and the Opinion (p.23-24), Bagwe's salary, including as it relates to those of her peers, is justified by objective variables such as time in service and prior work history, none of which Bagwe contests.

### d.  The Scope of Simpson's Investigation Is Not Evidence of Pretext.

Bagwe claims that the fact that Simpson expanded her 2009 investigation to include Bagwe and her actions with her co-workers instead of strictly limiting it to Bagwe's complaints, is evidence of pretext. (App. Br. 52.) As stated above (*e.g.*, Statement of the Case Section IV), there is no basis or support for drawing such a conclusion.

e.  Conflicting Recollections of the Specific Details of the Termination Decision Are Immaterial and Not Evidence of Pretext.

Bagwe seizes on certain inconsistencies in various witness' accounts of when and how the decision was made to terminate her. (App. Br. 38-39.) Upon closer scrutiny, it is clear that none of these purported contradictions are material.

Notably, the depositions in this case took place four years after Bagwe's termination. It would have been incredible (and arguably evidence of collusion) if each witness' recollection was exactly the same and 100% accurate given this time lag. Significantly, despite failing memories and the passage of time, the important facts leading up to Bagwe's termination remain undisputed: (1) while Papaioannou was on vacation in July 2009, two employees complained about Bagwe's interpersonal skills, one to LeClaire (Warner) and one to Papaioannou (Dooley) (R.144, ¶¶85-86,89), (2) after Papaiannou returned from Greece in late July 2009, she and LeClaire conferred and decided that LeClaire would recommend Bagwe's termination (R.144, ¶¶93-94), (3) Johnson and Browne were subsequently consulted and both approved the decision based on Bagwe's lack of interpersonal, communication and leadership skills (R.144, ¶97; 145-6, pp. 5-6 (transcript pp.68-69)), (4) Rachel Jackson was asked to deliver the termination and she made plans to do so on August 3, 2009 (R.144, ¶98; 163-56), and (5) Papaioannou's subsequent discussion with some of Bagwe's co-workers only served to confirm the original reasons for termination (R.144, ¶¶90-91).

*None* of the testimony cited by Bagwe as supposedly contradictory actually undermines these important facts. Therefore, the contradictions that she clings to

are entirely immaterial. *See, e.g., Springer*, 518 F.3d at 484 ("our favor toward the nonmoving party does not relieve it of the obligation to do more than simply show that there is some metaphysical doubt as to the material facts.") (internal quotation omitted).

Bagwe also attempts to argue that Sedgwick offered "shifting" explanations for her termination. (App. Br. 43-44) However, it is abundantly clear that the District Court correctly concluded that the different ways in which the various witnesses described the basis for her termination amount to semantics. (Opinion pp. 24-25.) For example, Bagwe claims that the fact that Bagwe was told that her "performance" was not the basis of her termination is evidence of shifting explanations. (App. Br. 43.) However, as has been repeatedly stressed above, there is no dispute that the technical aspects of Bagwe's job were not at issue – only her interpersonal skills were at issue. Bagwe also claims that the fact that client service was not affected is evidence that Bagwe could not possibly have been affecting operations. (App. Br. 43-44.) However, LeClaire testified that she considered the internal disruptions that were evident from Bagwe's repeated run-ins with her colleagues to affect operations, even if that impact had not yet reached the client. (R.144, ¶97.) None of these "shifting" explanations is inconsistent with any of the evidence in the record – that Bagwe's interpersonal, communication and leadership skills, as described using various words by different witnesses, were what led to her termination.

f.  LeClaire's Account of Bagwe's Performance Post-PIP Is Not Evidence of pretext.

Bagwe claims that LeClaire was unable to identify any issues between Bagwe and her co-workers between the PIP and the July 2009 incident with Warner. This is hardly evidence of pretext, as LeClaire's frustration with the situation with Warner, as well as Papaioannou's interactions with Dooley first, then Hernandez and Ramos after the fact, are more than sufficient to show that Bagwe's prior interpersonal issues had not been resolved, meriting her termination. The critical fact is not that there was a lull in activity between the March 2009 PIP and the July 2009 incident with Warner, but rather that the issues resurfaced, LeClaire, Papaioannou. Johnson and Brown all agreed that they merited termination. Whether this was a wise decision is beside the point, as this Court has repeatedly declined to sit as a super-personnel department. *E.g, Harris v. Warrick County Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012).

g.  Bagwe's Performance on Technical Aspects of Her Job Are Not Pretext.

Bagwe claims that the fact that there was "objective" evidence to suggest that her team was performing well establishes that the reasons given for her termination were pretextual. (*E.g.,* App. Br. 41.) However, Defendants have never denied that Bagwe was performing the technical aspects of her job adequately. Defendants have steadfastly maintained that Bagwe was not meeting performance expectations because of her communications and leadership skills as articulated above (*e.g.*, Statement of the Case Section III.B.). There is nothing inconsistent

about this position, nor does it indicate that the reasons given for Bagwe's termination were anything but truthful.

h.  The Procedures Used for Bagwe's Termination Are Not Evidence of Pretext.

Finally, Plaintiff claims Sedgwick failed to follow certain internal practices and procedures with respect to her termination, including filling out a termination checklist and allowing her to walk back to her office to retrieve her personal belongings after her termination meeting. (App. Br. 45-46.) Bagwe claims that this departure from standard procedure is evidence of pretext.

There is no evidence that these procedures were required or even implemented in every case, nor is there any evidence that Bagwe was at all prejudiced by the alleged deviation from standard procedure. Multiple witnesses testified that a termination checklist is not always used. (R.163-5, p.7 (transcript p.41); 163-7, p.12 (transcript p.85).) Furthermore, Enneking, to whom Bagwe compares herself, was treated similarly in that he also was escorted out of the building after his termination without the opportunity to retrieve his belongings. (R.144, ¶104.)

This Court has held that a departure from corporate policy cannot constitute evidence of discrimination or retaliation unless the corporate policy that plaintiff claims should have been followed "forbade" the complained-of behavior, or plaintiff can point to a corporate policy, procedure, or other evidence that demonstrated that it was improper for the company to take the complained-of actions. *Tank*, 785 F.3d at 806. Bagwe has clearly failed to meet these standards and as a result, the

inconsequential deviations from corporate practice and procedure that occurred at the time of Bagwe's termination cannot constitute evidence of pretext.

## IV. Miscellaneous Claims

### A. Bagwe's Pay Claims are Time Barred and Waived

As noted above, Bagwe makes three claims regarding her compensation: (1) that she should have received a promotional increase in 2005, (2) that she should have received a pay raise in 2007 when she functioned as the Interim Operations Manager IIII, and (3) that she should have received a higher merit increase in 2008. (App. Br. 4-5; Opinion pp.4-5.) In its opening brief, Defendants argued that Bagwe's pay claims are barred because they took place more than 300 days prior to the time she filed her Charge of Discrimination, and also because they predate the statute of limitations under Section 1981. (Dkt. 143, pp.9-10.) The District Court correctly found that Bagwe failed to address this argument in her Response and that it was therefore waived. (Opinion pp.15-16.)

Bagwe never argued at the District Court that her pay claims were not time barred pursuant to the Lilly Ledbetter Act. (Opinion pp.15-16.) Rather, she asserts this argument for the first time on appeal. She attempts to justify this oversight by summarily concluding that she "did not address Defendants' arguments relating to particular discrete acts or try to save them through the continuing violation doctrine because the alleged untimeliness of denied raises does not permit summary judgment on Bagwe's basic pay discrimination claims." (App. Br. 55.) This is hardly an explanation for why the well-established rule that arguments not raised below

are waived on appeal does not apply to Bagwe, or to Ledbetter-type arguments. It is also unsupported by any citation to authority whatsoever in violation of F.R.A.P. 28(a)(8)(A). It therefore must be disregarded. Any pay claims under Title VII or the IHRA prior to March 9, 2009 are waived, as well as any pay claims under Section 1981 prior to April 12, 2007.

Incredibly, the only basis Bagwe articulates for why her pay claims should survive is her allegation that "Defendant never moved for summary judgment on that claim, as evidenced by its briefing." (App. Br. 55.) This is simply not the case. Defendants' summary judgment briefing specifically and repeatedly argues the merits of Bagwe's complaints about her compensation. (*See, e.g.,* Dkt.143, p.12 (refuting Bagwe's complaint about her 2005 raise by pointing out white and American employees who were promoted without promotional pay raises and explaining the various factors that go into determining an employee's compensation); 143, p.3 (discussing Bagwe's pay claims in detail, including her claim that Enneking earned more than she did).) Bagwe's claim that arguments regarding her underlying pay claims have been waived are simply unsupported and untrue.

## Conclusion

The district court's grant of summary judgment in favor of Defendant-Appellees Sedgwick, LeClaire and Papaioannou was proper. Plaintiff-Appellant Bagwe's appeal should be denied and the judgment of the district court should be affirmed in its entirety.

Dated: March 4, 2015          Respectfully submitted

                                          SEDGWICK CLAIMS MANAGEMENT
                                          SERVICES, INC., TAMMY LECLAIRE AND
                                          ANGELA PAPAIOANNOU

                                          By:  __s/ Monica H. Khetarpal__
                                              One of Their Attorneys

Nadine C. Abrahams
Monica H. Khetarpal
Jason A. Selvey
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Tel: (312) 787-4949
abrahamsn@jacksonlewis.com
monica.khetarpal@jacksonlewis.com
selveyj@jacksonlewis.com

## Certificate of Compliance with Fed. R. App. P. 32(a)(7)(B)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,881 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). In making this certification, the undersigned counsel relies on the word-count feature of the Microsoft Word, Version 2010 software used to prepare this brief.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2010 in Century, double-spaced, 12 point font, with single-spaced footnote text in 12 point font.

Dated: March 4, 2015                    ___s/ Monica H. Khetarpal___
                                        One of the Attorneys for Defendant-
                                        Appellees

**Certificate of Compliance with Fed. R. App. P. 25 and Cir. R. 25**

The undersigned, an attorney, hereby certifies that Defendant-Appellees Sedgwick Claims Management Services, Inc., Tammy LeClaire and Angela Papaioannou have submitted to the court, via the court's electronic filing system, an electronic version of the Brief of Defendant-Appellees Sedgwick Claims Management Services, Inc., Tammy LeClaire and Angela Papaioannou in native Portable Document Format (PDF), in accordance with Circuit Court Rule 25(a), where feasible.

Dated: March 4, 2015                    ___s/ Monica H. Khetarpal___
                                        One of the Attorneys for Defendant-
                                        Appellees

## Certificate of Service

I hereby certify that on March 4, 2015, the Brief of Defendant-Appellees Sedgwick Claims Management Services, Inc., Tammy LeClaire and Angela Papaioannou was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. The following counsel for Plaintiff-Appellant Ratna Bagwe will be served by the appellate CM/ECF system:

J. Bryan Wood
The Law Office of J. Bryan Wood
542 S. Dearborn Street
Suite 610
Chicago, Illinois  60605
bryan@jbryanwoodlaw.com

The undersigned further certifies that she will cause 15 copies of the foregoing brief to be filed with the court via hand delivery, and will cause 2 additional copies of the same to be served upon counsel for Plaintiff-Appellant Ratna Bagwe by mailing true and correct copies via United States Mail, proper postage prepaid, within seven days of the notice of docket activity generated upon the clerk's acceptance of this electronic brief.

Dated: March 4, 2015                     s/ Monica H. Khetarpal
                                        One of the Attorneys for Defendant-
                                        Appellees.